CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
IJEOMA U. EKE (Bar No. 331938)
(E-Mail: Ijeoma_Eke@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-3107
Facsimile: (213) 894-7556

Attorneys for Defendant
OSCAR BELLO TORRES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br><br>OSCAR BELLO TORRES,<br>Defendant. | Case No. CR 21-294-GW<br><br>**DEFENDANT OSCAR BELLO TORRES POSITION RE: SENTENCING**<br><br>Hearing Date: July 11, 2022<br>Hearing Time: 8:00 a.m. |

Defendant Oscar Bello Torres, by and through his attorney of record, Deputy Federal Public Defender Ijeoma U. Eke, hereby files this sentencing position.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 24, 2022 By */s/ Ijeoma U. Eke*

IJEOMA U. EKE
Deputy Federal Public Defender
Attorney for Oscar Bello Torres

## I. ARGUMENT

Oscar Bello Torres has a backstory similar to many other defendants that come before the Court. He experienced instability and abuse at home due to an alcoholic and abusive father and isolation in school. Without a place of refuge, Mr. Torres turned to drugs to cope, leading to an addition that has spanned the majority of his life. However, the fact that Mr. Torres's story sounds like so many others does not mitigate its impact on his life. Instead, it further supports the notion that such experiences have a long-term effect.

### A. Mr. Torres's Unstable Childhood.

Mr. Torres was born on August 26, 1990, in Santa Barbara, California, to a poor, working-class, immigrant family. When he was two years old, his mother moved him and his younger brother to Mexicali, Mexico, to live with their extended family while their father stayed in Santa Barbara. While in Mexico, Mr. Torres attended elementary school and spent time with his grandfather. His grandfather would tell him stories about working as a bracero—a Mexican laborer allowed into the United States for a limited time as a seasonal agricultural worker—and protesting with Cesar Chavez. Compared to Mexicali, the United States was a land of dreams and Mr. Torres often dreamed about his return.

However, those dreams were cut short when Mr. Torres and his family moved back to Santa Barbara to reunite with his father in 2000. At ten years old, Mr. Torres and his brother saw their father for the first time in eight years. While Mr. Torres and his brother were excited to reunite with their father, Mr. Torres's father did not share in their excitement. In fact, Mr. Torres's father appeared shocked, angry, and even questioned Mr. Torres, his brother, and their mother as to why they were in the United States as if he did not want them to return. However, despite Mr. Torres's father's hostile welcoming, Mr. Torres, his brother, and their mother moved into his trailer park home.

Life with his father was not what young Mr. Torres expected. The trailer park was seedy and run-down. It was overrun with prostitutes and drug addicts. Unfortunately, the environment inside of Mr. Torres's home was not any better. Mr. Torres's father worked in landscaping from the early morning until the afternoon. When he would come home from work, he would drink with neighbors in the trailer park. As Mr. Torres's father drank, he often grew angry and would beat Mr. Torres and his brother, leaving welts on their legs. When Mr. Torres's mother would step in to protect her sons, Mr. Torres's father's anger was then directed at her, and she became his new victim. The reality of an alcoholic and abusive father shattered Mr. Torres's hopes and dreams of having a perfect life in the United States. As a young child in Mexico, Mr. Torres often imagined what life would be like once he was reunited with his father. Unfortunately, Mr. Torres's high hopes never measured up to reality. Due to the abuse Mr. Torres experienced at the hands of his father, he grew increasingly depressed.

As Mr. Torres's father was not as he expected, Mr. Torres soon developed a vendetta against his father which resulted in him rebelling. Mr. Torres was determined to be the opposite of what his father expected of him, which led to his poor school behavior. Mr. Torres was naturally highly energetic, making it difficult for him to sit still. As a Spanish speaker, Mr. Torres struggled to focus in class in a new and foreign language. Despite these challenges, Mr. Torres excelled in the majority of his classes. Due to Mr. Torres's ability to learn the material independently, he would often skip classes and hang out in the hallways. Even though he had inconsistent attendance, Mr. Torres outperformed the majority of his classmates on the exams. Mr. Torres only struggled with English. Struggling to communicate with his English-speaking

counterparts led to feelings of isolation, as many English Language Learner ("ELL") students often experience.[1]

Unfortunately, the sense of isolation and segregation is not limited to inside the classroom.[2] Studies show that children's social choices as to who they interact with at lunch, breaks, and after school are influenced by their language proficiency.[3] As a result, ELL students maintain a lack of access to social activities within the school setting, as well as afterschool activities such as participating in clubs or playdates.[4] With a limited amount of ELL students in his school, Mr. Torres's opportunities for social engagement were limited. This was confounded by the fact that Mr. Torres and his family were extremely poor. In Mexicali, Mexico, all the families appeared to be in the same socioeconomic class. However, in the United States, it was evident to Mr. Torres for the first time that his family was extremely poor and disadvantaged. Some of the most severe problems facing ELL children include poverty, and low parental education[5]—difficulties that Mr. Torres also encountered. In 2000, the year Mr. Torres moved back to the United States, 68% of ELL elementary school students were considered low income and 35% had parents with less than a high school degree.[6] With such odds, Mr. Torres was vulnerable to negative influences. In fact, the only children

---

[1] Rachel Loayza, *Decreasing The Social Gap Between English Language Learners and Native Speakers of English*, 2017, SCHOOL OF EDUCATION STUDENT CAPSTONE THESE AND DISSERTATIONS, 1, 2, https://digitalcommons.hamline.edu/cgi/viewcontent.cgi?article=5260&context=hse_all

[2] *Id.*

[3] *Id.*

[4] *Id.* at 8-9.

[5] *Id.*

[6] *Id.*

that interacted with Mr. Torres were those considered troublemakers. To avoid isolation, Mr. Torres became friends with the children that would eventually prove to be negative influences.

When Mr. Torres was twelve years old, his grandfather, the only real father-figure he had in his life, became sick. His mother left to care for him while Mr. Torres and his brother stayed with their father in Santa Barbara, California. Without Mr. Torres's mother present, Mr. Torres's father had unfettered access to Mr. Torres and his brother, allowing the abuse to continue. While Mr. Torres was dealing with abuse at home and isolation at school, his grandfather passed away. As a young child struggling to deal with continuous trauma, Mr. Torres fell further into depression. It was at this time that Mr. Torres's supposed friends offered him a means to escape. At just twelve years old, Mr. Torres began using marijuana to cope. A year later, Mr. Torres upgraded to methamphetamine—a daily addiction that persisted until his arrest in the instant offense.

**B. Mr. Torres's Struggle with Substance Abuse.**

Due to the trauma that Mr. Torres was experiencing, he was more susceptible to poor mental health. Exposure to marital discord and domestic violence are factors associated with increased rates of anxiety and depressive symptoms.[7] Poor mental health in turns leads to an increased risk of substance abuse. According to the National Institute on Drug Abuse, depressed young people often use drugs as an attempt to lessen the feelings of distress and Mr. Torres was no different.[8]

---

[7] *See* D Purper-Ouakil, G Michael, M-C Mouren-Siméoni, *Vulnerability to depression in children and adolescents: update and perspectives*, 28 ENCEPHALE 234, (2002); *see also* Andrew Clarke et al, *Violence exposure and young people's vulnerability, mental and physical health*, 65 INT. J. PUBLIC HEALTH 357, 357 (2020)

[8] *Principles of Adolescent Substance Use Disorder Treatment: A Research-Based Guide*, NAT'L INST. ON DRUG USE (2014),

At twelve years old, Mr. Torres began experimenting with marijuana. He would get the marijuana from his classmates and use it on the weekends or whenever he could sneak out of the class. A year later, Mr. Torres found himself sneaking out more and hanging out with people on the streets. It was at this time that, at the age of thirteen, that Mr. Torres began using methamphetamine. Mr. Torres's methamphetamine, at first, was casual but turned into daily use by the time he was seventeen years old.

Mr. Torres's substance abuse history started when he was still a young, developing child. Developmental research suggests that psychosocial maturity continues to develop well into a person's twenties, with the pace of maturation in boys being slower than that of girls.[9] Likewise, studies in neurobiology and psychology suggest that "cognitive skills and emotional intelligence continue to develop into a person's mid-20s, and even beyond."[10] As a result, young people are "overly motivated by reward seeking behavior, more susceptible to peer pressure, and more prone to risk-taking and impulsive behavior."[11] At twelve years old, it is clear that Mr. Torres's cognitive development was still transitory and not yet complete.[12]

---

https://www.drugabuse.gov/download/17691/principles-adolescent-substance-use-disorder-treatment-research-based-guide.pdf?v=e6f10c8e4b7f79d841ce1e1c1212319b.

[9] Emily Buss, *What The Law Should (And Should Not) Learn From Child Development Research*, 38 Hofstra L. Rev. 13, 39-40 (2009).

[10] Selen Siringil Perke, Lael Chester, *Emerging Adults: A distinct population that calls for an age-appropriate approach by the justice system, Emerging Adult Justice in Massachusetts*, 1, June 2017, https://scholar.harvard.edu/files/selenperker/files/emerging_adult_justice_issue_brief_final.pdf.

[11] *Id*.

[12] Samantha Buckingham, *Symposium: Reducing Incarceration For Youthful Offenders With a Developmental Approach to Sentencing*, 46 Loy. L.A. L. Rev. 801, 857 (2013).

Due to his early drug use, Mr. Torres's brain was forever altered by drug use while it was still developing. The earlier one starts using drugs, the greater the chances of continued use and addiction.[13] Substance abuse is a chronic medical disease that interferes with the mechanics of the brain.[14] While the original decision to use drugs is voluntary, with time the brain begins to release dopamine, leading to a euphoric feeling and reinforcement of drug-using behavior.[15] Such changes in the brain is what leads to compulsive, uncontrollable drug use.[16] Even worse, drug use during one's developmental stages can alter brain maturation and lead to lasting cognitive impairments.[17]

The drugs quickly consumed him. Mr. Torres craved methamphetamine and did anything he could to get it. It was under these circumstances that Mr. Torres committed the instant offenses. Mr. Torres's chronic use of methamphetamine undoubtedly began impacting his brain. Chronic methamphetamine use can permanently alter the central

---

[13] Harolyn M. E. Belcher, MD and Harold E. Shinitzky, PsyD, *Substance Abuse in Children: Prediction, Protection, and Prevention*, 27 JAMA PEDIATRICS 952 (1998).

[14] *Definition of Addiction*, AMERICAN SOCIETY OF MEDICINE, https://www.asam.org/Quality-Science/definition-of-addiction (last visited June 23, 2022).

[15] Jillian Hardee, Ph.D., *Science says: Addiction Is a Chronic Disease, Not a Moral Failing*, MICHIGAN HEALTH (May 19, 2017), https://healthblog.uofmhealth.org/brain-health/science-says-addiction-a-chronic-disease-not-a-moral-failing.

[16] *Id*.

[17] Ken C Winters and Amelia Arria, *Adolescent Brain Development and Drugs*, 18 *Prev Res*. 21 (2011).

nervous system.[18] This neuronal death creates significant brain damage.[19] Prolonged use of methamphetamine can result in loss of motor control, memory loss, and learning.[20] Most notably, methamphetamine effects the frontal and prefrontal cortex of the brain—areas that are responsible for cognition, reasoning, complex attention, problem-solving, and the inhibition of behaviors that might be damaging.[21] In combination with a brain that is still developing, such frontal and prefrontal cortex damage can lead to violent behavior, lack of restraint, and intense emotional reactions.[22] Without the ability to process the consequences of his actions due to prolonged drug use, Mr. Torres was even more susceptible to the perceived short-term benefits of criminal activity, with an impaired ability to contemplate the long term consequences of his actions.

### C. Mr. Torres's Struggles Continued as an Adolescent.

With a budding addiction, Mr. Torres's family struggled to provide the support he needed. As Spanish speakers and distrustful of American institutions, Mr. Torres's parents were unfamiliar with rehabilitation facilities. Without any options and the ability to help Mr. Torres through his addiction, Mr. Torres was forced to move out. Mr. Torres's father slammed his head against the wall, yelled at him, and forced him out the house. Without a place to go, Mr. Torres began living with different friends and sleeping on couches for the next two years. Without a stable residence, Mr. Torres was

---

[18] *Effects of Crystal Meth on the Brain and Central Nervous System*, American Addiction Centers, https://americanaddictioncenters.org/meth-treatment/effects-on-the-brain-and-cns (Last visited June 21, 2022).

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

constantly surrounded by negative influences, which led to him dropping out of high school when he was seventeen years old and moving to Ventura to live with his aunt in 2007. Mr. Torres's aunt was able to provide a stable residence, but without direction and guidance, Mr. Torres found himself deeper into his addiction and untethered lifestyle.

In 2012, when he was twenty-two years old, Mr. Torres's mother asked him to come back home. While he returned to his parents' home, he continued to struggle with his sobriety. Despite his struggles, Mr. Torres was determined to regain his sobriety. From 2013 to 2014, Mr. Torres successfully completed a rehabilitation program in lieu of a jail sentence. Based on Mr. Torres's success in the program, he was asked to speak at a Santa Barbara courthouse with judges in attendance. Mr. Torres was determined to turn his life around and started taking general education classes at Santa Barbara City College in hopes of working in bookkeeping or financial management. In addition to receiving college credits, Mr. Torres, who was only ten credits away from receiving his GED, was also receiving high school credits. Unfortunately, Mr. Torres was only able to complete a semester of school before he found himself in custody again. Determined to continue his school, Mr. Torres received his GED in 2019.

**D. A Path Forward.**

Despite his struggles and mistakes, Mr. Torres yearns to be a sober and a productive member of society. Prior to his arrest, Mr. Torres was using marijuana and methamphetamine on a daily basis. His criminal record is indicative of an individual who has struggled with addiction for the majority of his life. However, despite his addition, Mr. Torres was taking steps to improve himself by attending a Batters Treatment Program, but his efforts were cut short when he was incarcerated. *See* Exhibit A. Now, more than ever, Mr. Torres is determined to be a better person. Once released from custody, Mr. Torres intends to return to school. This time around, Mr. Torres has a new direction. Mr. Torres intends to attend school to become a drug and

alcohol counselor. As a person who has struggled with addiction for most of his life, Mr. Torres is uniquely situated to help others navigate through the same addiction that has plagued his life. Mr. Torres wants to be able to motivate others and share his experiences in hopes that he can prevent others from going down the same path he did. Therefore, a sentence of 120 months imprisonment and 5 years of supervised release is appropriate.

## II. APPLICATION OF SECTION 2D1.2 RESULTS IN UNREASONABLE SENTENCING RANGES

The Court should lend little weight to the guideline range in Mr. Torres's case, which is driven by the quantity of Ice methamphetamine—a mixture containing d-methamphetamine hydrochloride of at least 80% purity. U.S.S.G. § 2D1.1(c)(2); U.S.S.G. § 2D1.1(c), Note (C) to the Drug Quantity Table. Various courts have recently questioned the validity of the 10-to-1 ratio between the guideline ranges for Ice or actual methamphetamine and the ranges for a methamphetamine mixture.[23] The rationale running through these cases is that because methamphetamine today is uniformly pure, the distinction based on purity, is no longer grounded in logic or reality.

When the Commission promulgated the current methamphetamine guidelines, part of the reasoning was that if the drugs were purer, it meant the defendant played a more significant role in the drug operation. As the Commission stated: "Since

---

[23] *See United States v. Nawanna*, 321 F. Supp. 3d 943, 945 (N.D. Iowa 2018); *United States v. Harry*, 313 F. Supp. 3d 969, 973-75 (N.D. Iowa 2018); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1252-54 (D.N.M. 2017); *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013); *United States v. Bean*, No. 18-cr-057-03-LM, 2019 WL 1003338, at *1-8 (D.N.H. Mar. 1, 2019); *United States v. Pereda*, No. 18-cr-00228-CMA, 2019 WL 463027, at *1-6 (D. Colo. Feb. 6, 2019); *United States v. Hartle*, No. 4:16-cv-233-BLW, 2017 WL 2608221, at *1 (D. Idaho June 15, 2017).

controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."[24]

The Commission's reasoning may have made sense at the time the methamphetamine guidelines were put forward. Given the situation on the ground today, however, the Commission's "assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality."[25] As one district court opinion explained, "[d]ue to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise and the presumptive purity assigned to untested drugs does not reflect market realities."[26] In light of the fact that "most methamphetamine seized at all distribution levels is remarkably pure . . . higher purity is not a good indicator of a defendant's place in the chain of distribution."[27]

Because drug purity is no longer an accurate indicator of a defendant's role in a criminal enterprise, the current methamphetamine guidelines minimize the possibility of individualized sentencing. As another district court opinion explained, "because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor

---

[24] *Hayes*, 948 F. Supp. 2d at 1025 (quoting U.S.S.G. § 2D1.1, cmt. n.26(c)) (internal quotation marks omitted).

[25] *Ibarra-Sandoval*, 256 F. Supp. 3d at 1255.

[26] *Hartle*, 2017 WL 2608221, at *1.

[27] *Id*. at *3.

present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive."[28]

Further, similar to the racial disparate impact pre-First Step Act crack guideline had, the methamphetamine guideline has an equally fraught history. Methamphetamine did not even appear in the initial Drug Quantity Table precisely because it was not covered by the mandatory minimums in the 1986 Anti-Drug Abuse Act. Instead, the Commission assigned methamphetamine to the equivalency chart so that 1 gram of meth equaled 0.4 grams of heroin, 2 grams of cocaine, or 400 grams of marijuana.[29] No one knows how the Commission derived these initial equivalencies and penalties, as methamphetamine offenses were not included in the Commission's study of pre-Guideline sentencing practices.[30]

In 1988, Congress first established mandatory minimums for methamphetamine offenses.[31] Though it was not required to do so, the Commission responded "by incorporating these statutory penalties into the drug trafficking guideline" by using the "proportional approach" it had used for other controlled substances subject to

---

[28] *Nawanna*, 321 F. Supp. 3d at 954.

[29] *See Methamphetamine: Final Report of the Working Group* 7 (1999) [*Meth Report*], available at https://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/drugs/199911_Meth_Report.pdf at 7-8.

[30] *See Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987), available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf.

[31] *See* Anti-Drug Abuse Act of 1988 § 6470.

mandatory minimums.[32] As a result, guideline ranges for methamphetamine offenses increased by approximately 250%.[33]

Then, in 1998, Congress, as urged by the Department of Justice, cut in half the quantities triggering the mandatory minimums for offenses involving both methamphetamine mixture and methamphetamine (actual).[34] Also, at the behest of DOJ, Congress intended to make the penalties the same for methamphetamine (actual) as for crack cocaine.[35]

Notably, some members of the House Judiciary Committee dissented from the Committee's favorable report on the 1998 legislation, pointing out that "the need for this legislation has not been established" as a matter of sentencing policy, and that the Committee had not held "a single hearing."[36] They observed that the legislation "ignores the role of the [Sentencing Commission] in setting federal sentencing policy," and that the majority had been led by "political considerations which the Commission was designed to defuse."[37] They further stated their belief that "modeling any sentencing policy after the crack cocaine sentencing policy is unwise" in part "because mandatory minimum sentences have failed to significantly reduced trafficking in crack cocaine."[38]

---

[32] *Meth Report* at 8.

[33] *Id.*

[34] *See* Methamphetamine Trafficking Penalty Enhancement Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998); *see* H.R. Rep. No. 105-711, pt. 1, at 8 (1998).

[35] *See, e.g.*, *id.*; *see also* 144 Cong. Rec. S4035 (May 1, 1998) (Sen. Ashcroft); 144 Cong. Rec. S12834 (Oct. 21, 1998) (Sen. Feinstein).

[36] H.R. Rep. No. 105-711, pt. 1 at 10.

[37] *Id.*

[38] *Id.* at 11.

In this politically charged climate, and without giving any reason tied to the purposes of sentencing, the Commission amended the guideline for methamphetamine (actual) to cut in half the quantities at each offense level of the Drug Quantity Table, so that the guidelines would correspond to the quantities triggering the mandatory minimums and making the guidelines equivalent to the crack cocaine guidelines.[39]

Despite Congress having partially rectified the flawed crack cocaine guidelines, which disproportionally impacted Black defendants, no changes have been made to the methamphetamine guideline, the inflation of which explicitly depended on the since-amended crack guidelines. The data suggests that when mandatory minimum sentences became harder to charge for crack cocaine defendants, federal prosecutors shifted their priorities to methamphetamine prosecutions in which they could charge mandatory minimum quantities. And that shift is disproportionately impacting Hispanic offenders.

Methamphetamine defendants are over-represented with respect to the percentage (40.6%) who are convicted of mandatory minimums compared to their overall percentage among sentenced drug offenders (33.4%).[40] By contrast, after the statutory amendments for crack cocaine in the First Step Act, the number of crack cocaine defendants subject to a mandatory minimum sentence plummeted from 80.1% in 2010 to 46.6% in 2016.[41] In fact, implementation of the FSA appears to have led to fewer overall federal crack cocaine prosecutions.[42] Whereas before the implementation

---

[39] U.S.S.G. App. C, Amend. 594 (Nov. 1, 2000).

[40] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171025_Drug-Mand-Min.pdf#page=15, at 21.

[41] *Id.*

[42] *Id.* at 17.

of the FSA, Black offenders were the largest group subject to mandatory minimums, by fiscal year 2016, Hispanic offenders achieved that dubious distinction.[43]

Other data compiled by the Sentencing Commission shows that greater penalties for methamphetamine as opposed to crack cocaine defendants are not warranted. For example, the 2017 Commission study of drug trafficking convictions and recidivism concluded that people convicted of methamphetamine distribution had *lower* recidivism rates (29.5% reconvicted of *some* offense) than drug offenders in general (30.8% reconvicted of *some* offense), and significantly lower than those convicted of crack cocaine offenses (37.6% reconvicted of *some* offense).[44] Methamphetamine defendants who received a below-guideline sentence *not* sponsored by the government actually recidivated at a slightly *lower* rate than other methamphetamine offenders.[45]

The gravity of the artificially high guideline range for methamphetamine is further seen when compared to the guideline range for crimes of violence. Had Mr. Torres been convicted of any of the following serious violent crimes, among others, he would be facing a lower advisory sentencing guideline range:

| | | |
|---|---|---|
| Voluntary manslaughter | U.S.S.G. § 2A1.3 | BOL 29 |
| Attempted murder | U.S.S.G. § 2A2.1 | BOL 27 |
| Aggravated assault with permanent or life-threatening injury | U.S.S.G. § 2A2.2 | BOL 21 |

[43] *Id.* at 26.

[44] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170221_Recidivism-Drugs.pdf#page=9 [“*Recidivism Drugs*”].

[45] *Id.* at 88.

| | | |
|---|---|---|
| Interference with a flight crew with intention to endanger the safety of an aircraft | U.S.S.G. § 2A5.2 | BOL 30 |
| Bank robbery with a brandished firearm | U.S.S.G. § 2B3.1 | BOL 27 |

This is not to suggest that distributing methamphetamine does not contribute to significant harm to people in the community. It is to say, however, that subjecting individuals convicted of drug distribution to mandatory minimum sentences and guidelines higher than those established for these violent offenses is unwarranted.

The Court must sentence Mr. Torres to a 10-year mandatory minimum sentence, but it should not sentence him to a day more based on the arbitrary methamphetamine sentencing guidelines.

## III. THE PRESENENCE INVESTIGATION REPORT

In the Presentence Investigation Report ("PSR"), the Probation Office determined Mr. Torres's overall offense level to be 34 and criminal history category to be VI, with a resulting guideline range of 262 to 327 months imprisonment. *See* PSR ¶ 98. The defense does not object to the Probation Office's mechanical calculation of the guidelines. However, the defense does object to Probation's contention that there are no factors that warrant a recommendation for a variance outside of the advisory guideline range, PSR ¶ 156, based on the mitigating evidence outlined above.

## IV. CONCLUSION

For the foregoing reasons, Mr. Torres respectfully requests that the Court impose a sentence of 120 months imprisonment and 5 years of supervised release. Based on the mitigating factors, such a sentence is sufficient, but not greater than necessary, to achieve the aims of sentencing. Mr. Torres also requests the Court recommend the Residential Drug Abuse Program ("RDAP") and that Mr. Torres be housed at a Bureau of Prison ("BOP") facility in southern California.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 24, 2022

By *_/s/ Ijeoma U. Eke_*

IJEOMA U. EKE
Deputy Federal Public Defender
Oscar Bello Torres